UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT WINCHESTER

| | |
|---|---|
| STEVEN R. LAYNE, ) | |
| ) | |
| *Plaintiff,* ) | |
| ) | No. 4:17-CV-4 |
| v. ) | |
| ) | Judge Collier |
| OCWEN LOAN SERVICING, LLC, ) | Magistrate Judge Lee |
| ) | |
| *Defendant.* ) | |

## **M E M O R A N D U M**

Before the Court is Defendant Ocwen Loan Servicing LLC's ("Ocwen") motion for summary judgment (Doc. 18) on Plaintiff Steven Layne's claims arising out of the refinancing and modification of a loan. Plaintiff responded in opposition (Doc. 22), and Ocwen replied (Doc. 23). For the reasons that follow, the Court will **GRANT** Ocwen's motion for summary judgment (Doc. 18).

### I.  BACKGROUND

On July 28, 2007, Plaintiff Steven Layne and his wife Sheri Layne obtained a loan from Homecomings Financial, LLC ("Homecomings") in the amount of $228,000.00 (the "Loan") to purchase certain real property in Hillsboro, Tennessee. (Doc. 18-1.) To secure the Loan, Plaintiff executed a promissory note (the "Note") in favor of Homecomings (Doc. 18-1), as well as a deed of trust (the "Deed of Trust") (Doc. 18-2), which identified Homecomings as the Lender and Mortgage Electronic Registration Systems, Inc. ("MERS") as the beneficiary. Through various

transfers,[1] Ocwen was assigned both the Loan and the Deed of Trust. (Docs. 18-4 and 18-3, respectively.) Ocwen began servicing the Loan on February 16, 2013. (Doc. 18-4.)

Plaintiff's Note initially set a fixed interest rate of 7.875%. (Doc. 18-1.) Plaintiff modified the Loan in 2009, fixing a new interest rate at 6.875%. (Doc. 18-5.) In its first year, the 2009 Loan modification required Plaintiff make $1,601.79 in monthly principal and interest payments and $224.20 in escrow payments for a total monthly payment of $1,825.99. (*Id.*) The 2009 Loan modification agreement explained that the monthly escrow payments would adjust annually, and by the time Ocwen began servicing the Loan in 2013, Plaintiff's escrow payment had increased to $436.47. (Doc. 18-6.) As a result of the increased escrow payments, Plaintiff's monthly payment rose to $2,038.26.[2]

In August 2015, Ocwen sent a letter to Plaintiff briefly discussing the possibility of refinancing his Loan. (Doc. 18-7.) Specifically, the letter stated that Plaintiff "may be eligible to participate in the Home Affordable Refinance Program (HARP)," through Ocwen's lending affiliate. (*Id.*) Sometime thereafter, according to Plaintiff, an Ocwen representative, Bob Gormley, communicated to Plaintiff that the Loan was eligible for refinancing, which would drop the interest rate to 4.5% and decrease the total amount due. (Doc. 1.) However, after Plaintiff provided Ocwen with the requested documents, Gormley allegedly informed Plaintiff that the "refinancing would not be processed due to a mistake in Ocwen's records that erroneously

---

[1] The record indicates the Loan was transferred from Homecomings, to GMAC Mortgage, and then to Ocwen. (Doc. 18-4.) MERS transferred the Deed of Trust to Ocwen. (Doc. 18-3.)

[2] Plaintiff notes in his response that following the transfer of the Loan to Ocwen, the "payment steadily increased despite the interest rate being fixed at 6.85%." (Doc. 21 at 2.) Ocwen suggests this increase in the monthly payments was a result of the rising escrow payment, brought on by increasing property taxes and insurance premiums. (Doc. 19 at 3.) Plaintiff does not dispute this explanation. (Doc. 22.)

indicated Plaintiff's land plot contained 25 acres instead of the factual 17 acres contained in the land plot."[3] (*Id.*) Due to this alleged error, Ocwen denied refinancing the Loan.

A few months later, Plaintiff contacted Ocwen about the possibility of refinancing his Loan. In February 2016, Ocwen offered and Plaintiff accepted a trial modification plan, which required Plaintiff to make trial period payments of $1,088.40 monthly for three months. (Doc. 18-8.) This was a lower monthly payment in the immediate, designed to provide relief and the opportunity to assess whether a lower monthly payment could be managed. However, the trial plan also specifically provided:

> Any difference between the amount of the trial period payments and [Plaintiff's] regular mortgage payments will be added to the balance of [Plaintiff's] loan along with any other past due amounts. While this will increase the total amount that [Plaintiff] owe[s], it should not significantly change the amount of [Plaintiff's] modified mortgage payment.

(*Id.*)

If Plaintiff successfully completed the trial period, the Loan could then be permanently modified. Under the terms of the proposed permanent modification (the "Permanent Modification Offer"), Plaintiff's new monthly Loan payment was to be $1,097.22, with a new principal balance of $225,359.53. According to the Permanent Modification Offer, this increase in the principal balance consisted of the "unpaid amount(s) loaned to [Plaintiff] . . . plus any interest and other amounts capitalized." (Doc. 18-10.)

Plaintiff timely made the trial period payments but objected to the Permanent Modification Offer. According to Plaintiff, the "modification agreement . . . fraudulently and inexplicably increased the outstanding principal balance associated with the mortgage from $213,900 to over

---

[3] Ocwen neither expressly admits nor denies this interaction between Plaintiff and Gormley. It does note that Plaintiff has provided no evidence of the interaction, relying only on the allegation in the complaint.

$225,000." (Doc. 1.) Plaintiff refused to sign the agreement until he received an explanation regarding the increase in the total amount due. (Doc. 21.) Stephen King, an Ocwen agent, allegedly refused to provide Plaintiff with an explanation, instead urging Plaintiff to sign the agreement anyway. (*Id*.) Plaintiff did not sign and return the Permanent Modification Offer within the specified time period, and Ocwen subsequently notified Plaintiff that, as a result, the Loan could no longer be modified. (Doc. 18-9.) Plaintiff's property was eventually foreclosed on after Plaintiff failed to make the required payments on the Loan.[4]

On July 28, 2016, Plaintiff sent a twelve-page letter to Ocwen. (Doc. 18-11.) The letter purported to be a Qualified Written Request ("QWR"), asking Ocwen to hand over a long list of financial documents so that Plaintiff could "validate the debt" Ocwen claimed he owed. (*Id*.) Ocwen responded with a six-page letter of its own on September 1, 2016, providing some, but not all, of the information Plaintiff sought. (Doc. 18-12.)

Plaintiff filed this action on January 24, 2017, alleging five causes of action: (1) violation of the Tennessee Consumer Protection Act (the "TCPA"), (2) fraud, (3) misrepresentation, (4) negligence, and (5) violation of the Real Estate Settlement Procedures Act ("RESPA"). Ocwen moves for summary judgment on each of Plaintiff's claims.

## II.  STANDARD OF REVIEW

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897

---

[4] When precisely this happened is unclear. In his complaint, Plaintiff implies foreclosure proceedings commenced in June 2016. Ocwen offers no time frame as to when foreclosure occurred.

(6th Cir. 2003).  A factual dispute is "material" only if its resolution might affect the outcome of the lawsuit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The Court should view the evidence, including all reasonable inferences, in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

To survive a motion for summary judgment, "the non-moving party must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial."  *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002).  Indeed, a "[plaintiff] is not entitled to a trial on the basis of mere allegations."  *Smith v. City of Chattanooga*, No. 1:08-cv-63, 2009 WL 3762961, at *2–3 (E.D. Tenn. Nov. 4, 2009) (explaining the court must determine whether "the record contains sufficient facts and admissible evidence from which a rational jury could reasonably find in favor of [the] plaintiff").  In addition, should the non-moving party fail to provide evidence to support an essential element of its case, the movant can meet its burden of demonstrating no genuine issue of material fact exists by pointing out such failure to the court.  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).

At summary judgment, the Court's role is limited to determining whether the case contains sufficient evidence from which a jury could reasonably find for the non-movant.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).  If the Court concludes a fair-minded jury could not return a verdict in favor of the non-movant based on the record, the Court should grant summary judgment.  *Id.* at 251–52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

## III. DISCUSSION

Plaintiff alleges: (1) violations of the TCPA, (2) fraud, (3) misrepresentation, (4) negligence, and (5) a violation of RESPA. The Court addresses each in turn.

### A. Tennessee Consumer Protection Act Claims

The TCPA prohibits "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce." Tenn. Code Ann. § 47-18-104.[5] To make out a claim under the TCPA, a plaintiff must establish: "(1) an ascertainable loss of money or property; (2) that such loss resulted from an unfair or deceptive act or practice; and (3) that the act or practice is declared unlawful under the TCPA." *Amour v. Bank of Am., N.A.*, 1:13-CV-144, 2013 WL 6497821, at *5 (E.D. Tenn. Dec. 10, 2013) (citing Tenn. Code Ann. § 47–18–109). A deceptive act or practice is "a material representation, practice, or omission likely to mislead . . . reasonable consumers to their detriment." *Id.* (quoting *Fayne v. Vincent*, 301 S.W.3d 162, 177 (Tenn. 2009)).

Plaintiff alleges three instances in which Ocwen violated the TCPA. Two of these incidents relate to attempts to modify Plaintiff's Loan. The other involves Plaintiff's purported QWR.

#### 1. Loan Modification Claims

Plaintiff claims Ocwen violated the TCPA: (1) when it did not offer him a loan modification in 2015, and (2) when Ocwen increased his outstanding principle balance with respect to the Permanent Modification Offer in 2016. As to the former instance, Plaintiff suggests Ocwen acted unfairly and deceptively when it denied refinancing Plaintiff's Loan upon discovering an acreage error in its records concerning Plaintiff's property, even after informing Plaintiff his Loan qualified for refinancing. As to the latter claim, Plaintiff contends Ocwen ran

---

[5] In his complaint, Plaintiff does not cite to a specific portion of the TCPA. He instead cites Tenn. Code Ann. § 47-18-101 through § 47-18-130.

6

afoul of the TCPA specifically when it "fraudulently and inexplicably increased the outstanding principal balance associated with [the Loan] from $213,900 to over $225,000."

Ocwen disputes these factual assertions. But even assuming these allegations are true, Plaintiff's TCPA claims with respect to the modification of his Loan fail as a matter of law. Courts have consistently held that "the TCPA is inapplicable to loan modification proceedings because they deal with 'credit terms of a transaction' specifically exempted from the TCPA coverage." *Amour*, 2013 WL 6497821, at *5 (citing Tenn. Code Ann. § 47-18-111(a)(3); *see also Pugh v. Bank of Am.*, No. 13–2020, 2013 WL 3349649, at *9 (W.D. Tenn. July 2, 2013); *LeBlanc v. Bank of Am., N.A.*, No. 2:13–cv–02001–JPM–tmp, 2013 WL 3146829, at *7–8 (W.D. Tenn. June 18, 2013); *Silvestro v. Bank of Am., N.A.*, No. 3–13–0066, 2013 WL 1149301, at *5 (M.D. Tenn. Mar. 19, 2013); *French v. Specialized Loan Servicing*, LLC, 3:14-CV-519-PLR-HBG, 2016 WL 2930938, at *4 (E.D. Tenn. May 19, 2016). Plaintiff's contentions that Ocwen improperly denied refinancing Plaintiff's Loan in 2015 and improperly increased the principal balance owed in the Permanent Modification Offer both deal specifically with the loan modification process. As such, these particular TCPA claims must fail.[6]

### 2. Claims Related to Plaintiff's QWRs

Plaintiff's third claim under the TCPA is based on Ocwen's alleged failure to properly respond to Plaintiff's QWR. Ocwen argues that even if it did fail to respond to Plaintiff's QWR,[7]

---

[6] Plaintiff argues that only *foreclosure* activity is exempted from the TCPA's reach, and his claims under the TCPA do not relate to foreclosure activity. But courts have extended this exemption to loan modifications as well, and Plaintiff has offered no arguments to the contrary.

[7] Ocwen denies this allegation, maintaining that it did, in fact, timely and adequately respond to Plaintiff's purported QWR. This issue is addressed more fully in connection with Plaintiff's RESPA claim, below.

7

such a failure is not actionable under the TCPA. Ocwen notes that no specific provision in the TCPA requires loan servicers to respond to QWRs. And because a private right of action no longer exists under the TCPA's catch-all provision, Plaintiff cannot invoke that subsection to sustain his TCPA claim.[8] Moreover, since RESPA specifically addresses a loan servicer's duties with respect to QWRs, Ocwen contends, Plaintiff's claims relating to his QWR must be brought pursuant to that statute—not the TCPA.

Plaintiff acknowledges the absence of a specific TCPA provision requiring loan servicers to respond to QWRs. He cites, however, to the provision within the TCPA that prohibits "unfair or deceptive acts or practices affecting the conduct of trade or commerce." Tenn. Code Ann. § 47-18-104. This subsection denotes the spirit of the law, according to Plaintiff, and it is this subsection that makes Plaintiff's QWR claim viable under the TCPA.

Ocwen has the better argument. Plaintiff has pointed to no section within the TCPA that expressly addresses loan servicers' duties with respect to QWRs. These duties, rather, are outlined specifically in RESPA. 12 U.S.C. § 2605. The Court finds that Plaintiff's claims relating to his QWR are properly addressed under that provision, as opposed to the TCPA.

Because the coverage of the TCPA reaches neither loan modification proceedings nor loan servicers' responses to QWRs, the Court will grant Ocwen's motion for summary judgment as to Plaintiff's claims under the TCPA.

### B. Fraud and Misrepresentation

Plaintiff alleges both fraud and misrepresentation separately. The Court, however, addresses each together because: (1) Plaintiff alleges identical factual bases in support of both

---

[8] Ocwen cites Tenn. Code Ann. § 47-18-104(b)(27), which provides that "enforcement of [the TCPA's catch-all provision] is vested exclusively in the office of the attorney general and reporter and the director of the division."

claims, and (2) under Tennessee law, "[i]ntentional misrepresentation is analyzed as a claim for fraud."[9] *Power & Tel. Supply Co., Inc. v. SunTrust Banks, Inc.*, 447 F.3d 923, 931 (6th Cir. 2006) (citing *Shahrdar v. Global Hous., Inc.*, 983 S.W.2d 230, 237 (Tenn. Ct. App. 1998)).

Fraud is established where a plaintiff shows: "(1) an intentional misrepresentation of material fact; (2) the misrepresentation was made knowingly, without belief in its truth, or recklessly without regard to its truth or falsity; (3) the plaintiff reasonably relied on the misrepresentation and suffered damages; and (4) the misrepresentation relates to an existing or past fact." *Id.* Moreover, such a claim "must be stated with particularity, and the plaintiff must, at a minimum, allege the time, place and content of the misrepresentations; the defendant's fraudulent intent; the fraudulent scheme; and the injury resulting from the fraud." *Id.* The bases for Plaintiff's claims here involve two particular incidents mentioned previously: (1) Ocwen's failure to refinance Plaintiff's Loan in 2015 after discovering an error in its property records, and (2) the increase in the total amount due on Plaintiff's Loan in the Permanent Modification Offer.

### 1. The 2015 Failure to Refinance

Plaintiff claims Ocwen agent Bob Gormley fraudulently informed him in 2015 that his Loan qualified for refinancing, which would drop the interest rate on the Loan two percentage points and decrease the total amount owed. Plaintiff allegedly provided the documents Ocwen requested in an effort to modify the Loan as described. Gormley, however, later informed Plaintiff of a mistake in Ocwen's property records—they inaccurately showed that Plaintiff's property consisted of twenty-five acres, instead of seventeen. Plaintiff was subsequently informed that as a result of this initial error, the Loan would not be refinanced.

---

[9] Plaintiff does not specify whether he alleges intentional or negligent misrepresentation. He does, however, in his complaint claim Ocwen "knowingly" misrepresented material facts. (Doc. 1.) The Court thus treats Plaintiff's claim as one for intentional misrepresentation.

Ocwen notes Plaintiff has failed to offer any evidence that Gormley made the statements attributed to him. But even assuming those statements were made, Ocwen argues, Plaintiff has also failed to identify how those statements were knowingly false. Furthermore, Ocwen notes that statements about events in the future cannot form the basis of a fraudulent misrepresentation claim—the misrepresentation must concern an existing or past fact. Because the alleged statement concerned a modification to be undertaken in the future, Ocwen argues, Gormley's statements cannot be the basis of Plaintiff's claim.

The last of Ocwen's arguments is misplaced; Plaintiff specifically alleged in his complaint that Gormley told him his Loan qualified for refinancing—a representation about the Loan as it then existed. Ocwen's remaining arguments, however, are persuasive. Plaintiff has provided no evidence that Gormley made the alleged statements; he relies only on the bare allegations in his complaint.[10] Plaintiff has also failed to explain how Gormley's statement was knowingly false. In fact, even Plaintiff himself concedes the statement in question was born of a "mistake" in Ocwen's records—not a knowing falsity. Finally, Plaintiff has offered no explanation as to how he relied on this statement to his detriment, beyond being induced to gather financial documents to hand over to Ocwen. Plaintiff has stated no viable fraud claim with respect to Ocwen's alleged clerical error.

---

[10] The Court notes here that this is true of every assertion Plaintiff makes in defending against the motion before the Court. He has submitted no evidence to the Court. And the only citations made in his response to Ocwen's motion for summary judgment are to his own complaint. Bare allegations in a complaint may be enough to survive a motion to dismiss under Rule 12(b)(6). But at the summary judgment stage, "the non-moving party must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao*, 285 F.3d at 424. A plaintiff "is not entitled to a trial on the basis of mere allegations." *Smith*, 2009 WL 3762961, at *2–3. This lack of evidence plagues Plaintiff's defense against the motion before the Court.

## 2. The 2016 Permanent Modification Offer

The second basis for Plaintiff's fraud claim is the Permanent Modification Offer. Plaintiff alleges Ocwen "fraudulently and inexplicably increased the outstanding principal balance associated with the [Loan] from $213,900 to over $225,000." Though not expressly stated, the gist of this claim seems to be that Plaintiff was promised a reduction in his Loan payments and induced to make trial payments toward a loan modification, only to be told later that the modification was higher than the amount he was promised.

Ocwen says Plaintiff has provided no evidence of a false statement. In fact, notes Ocwen, Plaintiff was expressly informed that the total amount due after modification could be higher than it was before. The trial modification plan explained that "[a]ny difference between the amount of the trial period payments and [Plaintiff's] regular mortgage payments will be added to the balance of [Plaintiff's] loan along with any other past due amounts." Similarly, the Permanent Modification Offer explained that the "new principal balance" consisted of "the unpaid amount(s) loaned to [Plaintiff] by Lender plus any interest and other amounts capitalized." Showing its work, Ocwen calculates that in September 2015—when Plaintiff made his last payment before beginning the trial modification payments in March 2016—Plaintiff's unpaid principal balance on the Loan was $214,725.07. From September 2015 to March 2016, Plaintiff missed six regular payments of $2,118.26, and maintained an outstanding escrow balance of $2,791.90. Just as the trial modification plan and the Permanent Modification Offer said would happen, Ocwen notes, these unpaid amounts were added to the total amount Plaintiff owed.

Second, Ocwen submits that even if Plaintiff could identify a false statement, he cannot establish that he reasonably relied on that statement to his detriment. In other words, Plaintiff did not change his position for the worse in accepting the trial modification plan and making payments

toward a permanent modification thereafter. Because he could not make his regular payments on the Loan, Plaintiff had no alternative but to seek a modification.

Ocwen's arguments as to these claims are well-taken. First, Plaintiff has failed to identify any statement Ocwen made that he believes to be false. He does not specifically allege he was promised a lower total amount owed under a modified payment plan. He only suggests the total amount due was improperly raised, without refuting the express provisions in both the trial modification plan and the Permanent Modification Offer that the total could and would be increased.

Second, even if Plaintiff could identify a false statement, he has failed to establish how the injuries he suffered were a result of reasonable reliance on that statement. He first points to the payments he made as part of the trial modification plan as one of the injuries incurred. But Plaintiff already owed Ocwen in excess of $214,000. Had Plaintiff reached the point under the Permanent Modification where he was forced to go beyond that sum, he then could say he was harmed in paying an inappropriately high amount. But the $3,000-plus he paid as part of the trial modification was an amount he was obligated to pay regardless of whether he agreed to the trial modification plan or the Permanent Modification Offer. Plaintiff next points to the foreclosure on his property. But neither does this "injury" follow from Ocwen's alleged misrepresentations. The alleged promise that Plaintiff would pay a lesser total sum under the Permanent Modification Offer induced Plaintiff only to make the trial modification payments. Plaintiff never accepted the actual Permanent Modification Offer. The foreclosure on the property, therefore, resulted from Plaintiff's inability to make his *regular* (pre-trial-modification) payments. Thus, even if Ocwen never promised a lesser-payment loan modification, Plaintiff still would have been left with his regular Loan payments—that is, the very payments on which he defaulted.

12

Because Plaintiff has failed to identify statements he believes Ocwen falsely made and how his alleged injuries resulted from reasonable reliance thereon, the Court finds Plaintiff has not met his evidentiary burden with respect to his claims for fraud and misrepresentation. Accordingly, the Court will dismiss those claims.

### C. Negligence

Plaintiff's negligence claim arises out of Ocwen's rejection of Plaintiff's Loan for refinancing in 2015. As described above, Ocwen agent Bob Gormley allegedly told Plaintiff his Loan qualified for refinancing, which would drop both the interest rate and the total amount due on the Loan. However, upon discovering that Plaintiff's property acreage was inaccurately reflected in its records, Ocwen informed Plaintiff it would not refinance the Loan. Plaintiff insists this error constitutes negligence because Ocwen had record notice of the property's correct acreage via the tax assessor's office since January 2005.

"To establish a claim for negligence, a plaintiff must demonstrate (1) a duty of care owed by the defendant to the plaintiff; (2) conduct by the defendant falling below the applicable standard of care; (3) an injury or loss; (4) causation in fact; and (5) proximate, or legal, causation." *Power & Tel. Supply Co.*, 447 F.3d at 932 (citing *Bradshaw v. Daniel*, 854 S.W.2d 865, 869 (Tenn. 1993)). The duty element "is entirely a question of law for the court." *Id*.

With respect to financial institutions in particular, "Tennessee does not impose a common law duty on [such] institutions with respect to their customers, depositors, or borrowers," absent special circumstances. *Permobil, Inc. v. Am. Express Travel Related Servs. Co.,* 571 F. Supp. 2d 825, 842 (M.D. Tenn. 2008). This general rule, moreover, has been expressly extended to the relationship between loan servicers and borrowers. *E.g.*, *Vaughter v. BAC Home Loans Servicing, LP*, No. 3:11-CV00776, 2012 WL 162398, at *5 (M.D. Tenn. Jan. 19, 2012). Because it owed

Plaintiff no duty as his loan servicer, Ocwen argues, Plaintiff cannot establish the first element of his negligence claim.

In response, Plaintiff concedes that loan servicers generally owe borrowers no duty of care. Nevertheless, he contends, his negligence claim is viable because Ocwen owed him a duty under the Home Affordable Modification Program ("HAMP"). Specifically, Plaintiff argues that "a duty of care arises when a servicer attempts to go beyond the normal banking operations such as attempting to review or modify a loan pursuant to HAMP guidelines." (Doc. 21 at 8.)

This argument, however, is directly contradicted by Tennessee law. "[C]ourts assessing this exact issue . . . have routinely dismissed negligence claims based on violations of the HAMP guidelines." *Fed. Nat'l Mortg. Ass'n v. Carr*, 3:12-CV-1295, 2013 WL 5755083, at *3 (M.D. Tenn. Oct. 23, 2013) (citing *Williams v. SunTrust Mortg., Inc.*, No. 12–cv–0477, 2013 WL 1209623, at *3–4 (E.D. Tenn. Mar. 25, 2013); *Silvestro v. Bank of Am., N.A.*, No. 13–cv–0066, 2013 WL 1149301, at *4 (M.D. Tenn. Mar. 19, 2013); *Grona v. CitiMortgage, Inc.*, No. 3-12-0039, 2012 WL 1108117, at *3–4 (M.D. Tenn. Apr. 2, 2012); *Clay v. First Horizon Home Loan Corp.*, 392 S.W.3d 72 (Tenn. Ct. App. 2012)).

Because Plaintiff has failed to establish Ocwen owed him a duty of care as servicer of his Loan, Plaintiff's negligence claim fails as a matter of law.

### D. RESPA Violation

Under RESPA, "[i]f any servicer of a federally related mortgage loan receives a qualified written request ["QWR"] from the borrower (or an agent of the borrower) for information relating to the servicing of such loan, the servicer shall provide a written response acknowledging receipt of the correspondence within 5 days (excluding legal public holidays, Saturdays, and Sundays) unless the action requested is taken within such period." *Jestes v. Saxon Mortg. Servs., Inc.*, No.

14

2:11–00059, 2014 WL 1847806, at *5 (M.D. Tenn. May 8, 2014) (quoting 12 U.S.C. § 2605(e)(1)(A)). A proper QWR must enable the servicer to identify the name and account of the borrower and include a statement of the reasons for the borrower's belief that the account is in error or provide sufficient detail to the servicer regarding other information sought by the borrower. 12 U.S.C. § 2605(e)(1)(B). "Within thirty days of receipt of a QWR the servicer must either make appropriate corrections to the borrower's account or, after investigation, provide a written explanation including a statement of reasons the servicer believes the account is correct or any other information requested by the borrower." *Jestes*, 2014 WL 1847806, at *5 (quoting 12 U.S.C. § 2605(e)(2)). This period also excludes legal public holidays and weekends. 12 U.S.C. § 2605(e)(2). "[T]o state a viable claim under RESPA, a plaintiff must show that he sent a correspondence which met the requirements of a QWR, that the servicer failed to timely respond, and that this failure caused plaintiff actual damages." *Id*. (quoting *Williams v. Wells Fargo Bank, N.A.*, No. 13-10233, 2014 WL 1044304, at *7 (5th Cir. Mar. 19, 2014)).

Plaintiff's RESPA claim is based on a twelve-page letter sent to Ocwen on July 28, 2016. Plaintiff argues this letter was a proper QWR under the statute, as it expressly purported to be a QWR, made servicing-related inquiries, and requested servicing-related documents. And because Ocwen failed to timely respond to the QWR, Plaintiff maintains, Ocwen failed its duty under the statute.[11]

Ocwen, in contrast, says the letter does not constitute a proper QWR. It notes the letter does not ask servicing-related questions specific to Plaintiff's Loan, but rather requests a long list

---

[11] The Court notes Plaintiff's inconsistency with respect to his QWR allegations. In his complaint, Plaintiff alleges both that Ocwen failed to timely respond to his QWR and that Ocwen failed to respond altogether. He revives both these allegations in his response to the motion before the Court, as well. Plaintiff, however, concedes in his responses to Ocwen's statement of material facts that Ocwen *did*, in fact, respond to his QWR.

of generic financial documents, many of which pertain only to the Loan's origination. Furthermore, Ocwen contends it did, in fact, timely respond to the inquiries. Plaintiff sent his letter on July 28, 2016, and Ocwen responded with its own letter on September 1, 2016. Excluding weekends, this response falls within the thirty-day window set by the statute.

The Court notes Ocwen did satisfy *part* of its timeliness obligation; it sent its *substantive* reply to Plaintiff's inquiries within thirty business days as RESPA requires. But RESPA also requires that the loan servicer "provide a written response acknowledging receipt" of the QWR within five days. 12 U.S.C. § 2605(e)(1)(A). Ocwen has provided no evidence to suggest it acknowledged receipt of Plaintiff's July 28, 2016 letter within the given time frame. This, though, is not fatal to Ocwen's position, because Plaintiff's RESPA claim fails for other reasons: (1) Plaintiff's letter does not constitute a proper QWR, and (2) Plaintiff has failed to show actual damages stemming from Ocwen's untimeliness.

A proper QWR must pertain specifically to the servicing of a loan—that is, the receiving of scheduled periodic payments made by a borrower under the terms of the applicable loan agreement. 12 U.S.C. § 2605(i)(3). Plaintiff's letter here, however, amounts to little more than a lengthy request for generic financial documents, many of which relate only to the Loan's origination; the letter ventures into subjects wholly unrelated to loan servicing, such as attorneys' fees and property inspections; and nowhere does the letter identify specifically how Ocwen had erred in servicing Plaintiff's Loan, as required under 12 U.S.C. 2605(e)(1)(B).[12] These types of

---

[12] Plaintiff's letter does include a section entitled "Servicing Related Questions." But the questions in this section pertain only to the origination of the Loan, rather than actual servicing-related matters. Loan origination is not a proper subject of a QWR. *See Jestes*, 2014 WL 1847806, at *7 (quoting *Medrano v. Flagstar Bank, FSB*, 704 F.3d 661, 666–67 (9th Cir. 2012) ("Servicing . . . does not include the transactions and circumstances surrounding a loan's origination . . . [because] [s]uch events precede the servicer's role in receiving the borrower's payments and making payments to the borrower's creditors.")).

communications have been routinely rejected as improper QWRs.[13] As such, Ocwen had no duty to respond to Plaintiff's letter under RESPA.

Moreover, even assuming Ocwen did a have a duty to respond and failed to timely do so, Plaintiff has failed to establish actual damages as a result thereof. As noted above, Ocwen violated only part of the RESPA statute. It did, in fact, respond substantively to Plaintiff's inquiries within the thirty-day window as RESPA requires. Where it failed was not notifying Plaintiff it had received his letter within five days. To therefore state a viable claim under RESPA, Plaintiff must demonstrate he incurred actual damages from the lack of initial notification—not from a failure to respond altogether. Plaintiff has submitted no evidence of such damage.

Because Plaintiff's July 28, 2016 letter did not constitute a proper QWR and because Plaintiff has failed to establish actual damages as a result of the alleged RESPA violation, the Court will dismiss Plaintiff's claim under RESPA.

---

[13] *See French*, 2016 WL 2930938, at *3 ("[The plaintiff's 24-page] letter contained a generic laundry list of document requests and legal arguments, none of which were specific to plaintiffs or their loan."); *Minson v. CitiMortgage Inc.*, No. DKC 12-2233, 2013 WL 2383658 at *5 (D. Md. May 29, 2013) (holding that communication which cited RESPA and claimed to be a QWR was improper because it sought copies of loan documents and proof of servicer's authority to service the loan); *McGory v. BAC Home Loan Servs. LP*, No. 3:10-CV-1758, 2011 WL 1743475 at *2–3 (N.D. Ohio May 6, 2011) (holding the servicer had no obligation to respond to purported QWR which requested all documents pertaining to the origination of mortgage, as well as certified copies of loan documents, allonges, assignment and transfer receipts); *Reyes v. Bank of Am., NA*, No. 2:11-CV-01367, 2012 WL 6089480, at *2 (D. Nev. Dec. 5, 2012) (dismissing claim where purported QWR did not identify specific error, appeared copied from another source, read like a discovery request, and inquired into "every conceivable aspect of the parties' interaction.").

## IV. CONCLUSION

For the foregoing reasons, the Court concludes Plaintiff has not carried his burden with respect to his claims. The Court will **GRANT** Ocwen's motion for summary judgment. (Doc. 18.)

**An appropriate order shall enter.**

/s/
**CURTIS L. COLLIER
UNITED STATES DISTRICT JUDGE**